Opinion issued October 11, 2007


 











In The

Court of Appeals

For The

First District of Texas






NO. 01-05-01091-CV






GEORGE THOMAS COX, Appellant


V.


SOUTHERN GARRETT, L.L.C., SOUTHERN CHEMICAL CORP.,
EXCELERATE TRADING, L.L.C., ROGER MOYERS, STEPHEN
KORKMAS, WILDEBRAND H. SPIN, FRED WOOD, JAN T. SPIN, AND
ABC CHEMICAL CORP., Appellees






On Appeal from the 280th District Court

Harris County, Texas

Trial Court Cause No. 2004-17850






O P I N I O N


 Appellant, George Thomas Cox, appeals a take-nothing final judgment that the
trial court granted in favor of appellees, Southern Garrett, L.L.C., Southern Chemical
Corp., Excelerate Trading, L.L.C., Roger Moyers, Stephen Korkmas, Wildebrand H.
Spin, Fred Wood, Jan T. Spin, and ABC Chemical Corp. In three issues on appeal,
Cox argues that the trial court erred by (1) refusing to enforce Southern Garrett's
membership regulations; (2) granting directed verdict on Cox's claim for breach of
fiduciary duty; and (3) granting directed verdict on Cox's claim for piercing the
corporate veil of Excelerate and ABC Chemical. 

 We affirm.

Background


 This dispute turns on the construction of an agreement regarding termination
of membership in a limited liability company. In 2002, Roger Moyers and Mark
Brueggeman approached Cox about purchasing a methanol distribution business from
Lyondell. At the time, Cox was the president of Garrett Oil. Moyers, Brueggeman,
and Cox eventually formed Garrett Petrochemicals (1) to acquire the methanol
distribution business from Lyondell. (2) Because Lyondell was exiting the methanol
business, it suggested to Cox, Moyers, and Brueggeman that they should contact
Southern Chemical to secure a methanol supply for Lyondell's existing customers. 

 Southern Chemical is one of the largest importers of chemicals in North
America. Vey Spin serves as President of Southern Chemical, and Vey's son, Jan
Spin, serves as a director. Cox had discussions with Southern Chemical that led to
the formation of Southern Garrett, a limited liability company, around October 2002. 
Southern Garrett was owned equally by Moyers, Brueggeman, Cox, and Southern
Chemical, each owning a 25% interest. The purpose of Southern Garrett was to
acquire Lyondell's methanol distribution business and to diversify into other markets.

 Although Southern Garrett had some rough times due to fluctuations in the
methanol market, the company experienced success. However, Cox and Vey Spin
had differences of opinion that culminated in an August 19, 2003 meeting in which
the members discussed purchasing Cox's 25% interest in Southern Garrett. The
evidence conflicted as to the terms of Cox's withdrawal from Southern Garrett. Cox
believed that he had agreed to a buyout in the amount of $550,000 in the August 19
meeting, and he drafted a letter to Southern Garrett accepting the alleged offer. The
other members of Southern Garrett, however, believed the buyout price for Cox's
25% interest was an amount to be determined once they had evaluated the financials
of the company. 

 On August 25, 2003, Southern Garrett sent a letter proposing a buyout figure
of $500,000 based on profits after certain deductions for bonuses for non-partner
employees. The letter stated, "Your signed acceptance of the aforementioned items
constitutes the full agreement that your ownership and consequently any rights to
past, present, and future profits in [Southern Garrett] will be relinquished in full as
of August 31, 2003." Cox refused to sign the letter. However, on September 29,
2003, Southern Garrett delivered a second letter to Cox, offering to buy him out
effective August 31, 2003 for $506,208.91, along with a check in that amount. The
letter contained a release of liability, which Cox did not sign. The memo line of the
check read "G. Thomas Cox Buyout of Southern Garrett, L.L.C." Cox cashed the
check on September 30, 2003. 

 On April 6, 2004, Cox sued the defendants after receiving a letter from
Southern Garrett's accountants that said 2004 would be Cox's last year as a member. 
In his sixth amended petition, Cox alleged breach of fiduciary duty, breach of
contract, conspiracy, common law fraud by non-disclosure, piercing the corporate
veil, and conversion, and he sued for an accounting. The defendants denied the
allegations, asserted affirmative defenses, and filed a counterclaim. (3)

 After the close of Cox's case in chief, the defendants moved for directed
verdict on a variety of Cox's claims. The trial court ruled as a matter of law that Cox
had withdrawn from membership in Southern Garrett, and it granted a directed verdict
on all of Cox's claims except the claim that Cox and Southern Garrett had entered
into an agreement whereby Southern Garrett would purchase Cox's 25% interest for
$550,000. After it granted the directed verdicts, the trial court made it clear to the
parties that the court considered the case to be "a breach of contract case of plaintiff
against Southern Garrett for the sum of $44,000 something" and that the only issue
left to try was whether Cox and Southern Garrett had an agreement for Southern
Garrett to pay Cox $550,000 for Cox's 25% interest. The question whether there was
such an agreement was submitted to a jury, which answered the question in the
negative. (4) Cox filed a motion to vacate or modify the judgment, or in the alternative,
for new trial. The trial court denied Cox's motion for new trial on November 11,
2005. On appeal, Cox does not challenge the jury's finding that there was no such
agreement.

Analysis


 Standard of Review

 A trial court may direct a verdict either when a plaintiff fails to present
evidence raising a fact issue essential to its right of recovery or when the evidence
conclusively proves a fact that establishes the movant's right to judgment as a matter
of law. Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex.
2000); Cortez v. HCCI-San Antonio, Inc., 131 S.W.3d 113, 120 (Tex. App.--San
Antonio 2004), aff'd, 159 S.W.3d 87 (Tex. 2005). In reviewing the granting of a
directed verdict, we follow the standard of review for assessing the legal sufficiency
of the evidence. S.V. v. R.V., 933 S.W.2d 1, 8 (Tex. 1996); see generally City of
Keller v. Wilson, 168 S.W.3d 802 (Tex. 2005). In reviewing the trial court's granting
of an instructed verdict, the evidence must be considered in the light most favorable
to the party against whom the verdict is instructed. Texas Employers Ins. Ass'n v.
Page, 553 S.W.2d 98, 102 (Tex. 1977). We must determine if there is any conflicting
evidence of probative value that raises a material fact issue. White v. Southwestern
Bell Tel. Co., 651 S.W.2d 260, 262 (Tex. 1983). If there is any such evidence on any
theory of recovery, a determination of that issue is for the jury. Szczepanik v. First
S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994). We can consider any reason why the
directed verdict should have been granted, even if not stated in the party's motion. 
Gonzales v. Willis, 995 S.W.2d 729, 740 (Tex. App.--San Antonio 1999, no pet.).

 Membership Regulations

 In his first issue, Cox argues that the "trial court erred when it refused to
enforce Southern Garrett's Membership Regulations--the sole agreement among
Southern Garrett's members--regarding the disposition and acquisition of
membership interests." 

 He contends that the trial court erred by not enforcing this paragraph of the
Membership Regulations because Moyers admitted at trial that he did not comply
with paragraph 4.2 with respect to the disposition of Cox's interest. In effect, Cox
argues that the evidence showed that the defendants breached a contract, namely the
Membership Regulations. Cox further argues that a disposition of his 25% interest
could not "become effective until [paragraph] 4.2 of the Regulations had been
satisfied." Thus "any 'attempted disposition' of Cox's 25% interest was 'void' under
Paragraph 4.2," and "[i]f the disposition of Cox's 25% interest in Southern Garrett
was 'void,' then, in accordance with the Regulations, ownership of Cox's original
25% of Southern Garrett still resides in Cox." (Emphasis added.) Cox argues that,
because he is still a member in Southern Garrett, the "Regulations entitle Cox to
receive membership distributions." 

 The defendants argue that paragraph 4.2 does not apply to Cox's withdrawal
because it was meant to apply only to the disposition from a member to an outside
party of Southern Garrett, i.e., a non-member. Because Cox, a member of Southern
Garrett during the August 19, 2003 meeting, was attempting to sell his interest back
to Southern Garrett, the operative section is paragraph 4.5 of the Membership
Regulations, entitled "Distribution to Withdrawing Members." 

 Because the trial court granted a directed verdict on Cox's allegations that
Southern Garrett's Membership Regulations had been breached and held that Cox had
withdrawn from the company, despite Cox's contentions that he did not withdraw, we
address Cox's arguments that as a matter of law "an agreement for Cox to sell his
25% interest . . . could [not] have become effective until [paragraph] 4.2 of the
Regulations had been satisfied" and that "any 'attempted disposition' of Cox's 25%
interest was 'void' under Paragraph 4.2." 

 In construing a contract, our primary concern is to ascertain and give effect to
the intentions of the parties as expressed in the contract. Kelley-Coppedge, Inc. v.
Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998). To ascertain the parties' true
intentions, we examine the entire agreement in an effort to harmonize and give effect
to all of its provisions so that none will be rendered meaningless. MCI Telecomms. 
Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 652 (Tex. 1999). Whether a contract
is ambiguous is a question of law for the court. Heritage Res., Inc. v. NationsBank,
939 S.W.2d 118, 121 (Tex. 1996). A contract is ambiguous when its meaning is
uncertain and doubtful or when it is susceptible to more than one reasonable
interpretation. Id. However, when a written contract is worded so that it can be given
a certain or definite legal meaning or interpretation, it is unambiguous and the court
construes it as a matter of law. Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154,
157 (Tex. 2003).

 The elements of a valid contract are (1) an offer, (2) an acceptance, (3) a
meeting of the minds, (4) each party's consent to the terms, and, in the case of a
written contract, (5) execution and delivery of the contract with the intent that it be
mutual and binding. Prime Prods., Inc. v. S.S.I. Plastics, Inc., 97 S.W.3d 631, 636
(Tex. App.--Houston [1st Dist.] 2002, pet. denied); Copeland v. Alsobrook, 3 S.W.3d
598, 604 (Tex. App.--San Antonio 1999, pet. denied). The determination of a
meeting of the minds, and thus offer and acceptance, is based on the objective
standard of what the parties said and did, and not on their subjective state of mind. 
Copeland, 3 S.W.3d at 604. 

 Paragraph 4.2

 Cox argues that paragraph 4.2 of the Membership Regulations, entitled
"Restrictions on the Disposition of a Membership Interest," governs the disposition
of membership interests, including the sale of his interest in Southern Garrett to the
other members. Cox contends that paragraph 4.2 of the Membership Regulations
governs the disposition of his membership interest in Southern Garrett and that the
defendants failed to comply with paragraph 4.2, so that his withdrawal from the
company was void. 

 Paragraph 4.2 provides:

 4.2 Restrictions on the Disposition of a Membership Interest. 
No Member of the Company may dispose of all or any
portion of his Membership Interest without the consent of
a Required Interest and except in compliance with this
Paragraph 4.2. Any attempted Disposition in violation
hereof shall be void. As a condition of any purported
Disposition of a Membership Interest or any portion
thereof:


 (a) The Manager must receive, on behalf of the
Company, a document (i) executed by both the
Member effecting the Disposition (or, if applicable,
the Member's legal representative) and the Person to
whom the membership Interest, or part thereof, is to
be disposed; (ii) including the notice address of any
Person to be admitted and such Person's agreement
to be bound by the Articles and these Regulations;
and (iii) setting forth the new Sharing Ratios (after
the proposed Disposition) of the Member effecting
the Disposition and the Person to whom the
Membership Interest or part thereof is to be
Disposed. 

 In the definitions' section of the regulations, the term "Person" is defined as the
"meaning given that term in article 1.02(A)(4) of the Act." The current version of the
Limited Liability Act defines "Person" as: 

an individual, corporation, business trust, estate, trust, custodian, trustee,
executor, administrator, nominee, partnership, registered limited liability
partnership, limited partnership, association, limited liability company,
government, governmental subdivision, governmental agency,
governmental instrumentality, and any other legal or commercial entity,
in its own or representative capacity. Any of the foregoing entities may
be formed under the laws of this state or any other jurisdiction.


Tex. Rev. Civ. Stat. Ann. art. 1528n § 1.02(A)(4) (Vernon Supp. 2006). The term
"Person" does not include the term "Member" as used in paragraph 4.2. The
regulations define "Member" as "any Person executing these Regulations or hereafter
admitted to the Company as a Member as provided in these Regulations, but does not
include any Person who has ceased to be a Member in the Company." 

 Although Cox complains that the manager did not receive the documents called
for in paragraph 4.2(a), a plain reading of Article 4 demonstrates that paragraph 4.2
applies to the disposition of Membership Interests to Persons who are not Members. 
The purpose of paragraph 4.2 is to provide rules for the disposition of a Member's
interest to a non-member, i.e., a person who has not been admitted to the limited
liability company. Various sub-sections within paragraph 4.2 use the phrase "Person
to be admitted" which supports our interpretation that "Person" in paragraph 4.2
refers only to non-members of the company. We hold, therefore, as a matter of law,
that paragraph 4.2 would apply only if Cox were selling his interest to an outside
party who was not at that time a member of Southern Garrett. Thus, to the extent that
Cox asked the trial court to enforce section 4.2 of the Membership Regulations, the
trial court properly refused to do so because paragraph 4.2 is not applicable to the
facts of this case. 

 Paragraph 4.5

 The defendants contend that paragraph 4.5 of the Membership Regulations
govern the terms of a Member's withdrawal from the company and that the company
complied with section 4.5 upon Cox's withdrawal. Paragraph 4.5 provides:

4.5 Distribution to Withdrawing Members. For purposes of this
paragraph, a Member shall be deemed to have withdrawn from
the Company upon such Member's voluntary withdrawal, death,
judicially determined incompetence, retirement, resignation,
expulsion, bankruptcy or dissolution, or any other event which
terminates the continued membership of a Member. Unless such
withdrawal shall result in the dissolution of the Company, and
subject to § 5.09 of the Act, a withdrawing Member shall be
entitled to receive the fair value of the withdrawing Member's
interest. 


 (a) The "fair value of the Membership Interest shall be
determined as of the first day of the month following the
date of the occurrence giving rise to the Member's
withdrawal ("Determination Date").


 (b) Within 180 days from the Determination Date, the
Company and the withdrawing Member (or his legal
representative, if applicable) shall attempt to agree upon
the fair value of the Member's Membership Interest.


 Here, the evidence showed that on August 19, 2003, after the Members'
meeting, Cox gave a letter to Southern Garrett accepting Southern Garrett's alleged
offer to buy his 25% ownership interest in Southern Garrett for $550,000. Cox
wanted this deal, notwithstanding the regulations, because he wanted to receive his
buyout sooner rather than later. The evidence also showed that Southern Garrett sent
a letter to Cox on August 25, 2003, offering a buyout of Cox's 25% ownership
interest for $500,000, to be effective August 31, 2003. The letter states that "it is
important that the partnership has a complete and thorough understanding of the
conditions, procedures, and conclusions by which your [25%] ownership, hereinafter
referred to as ownership, in [Southern Garrett] will be handled upon your exit from
the company." (Emphasis added.) Cox did not sign this letter. 

 Southern Garrett sent a second letter on September 24, 2003 that included a
new buyout figure of $506,208.91, but retained the August 31, 2003 buyout date. 
Both the August 25 and September 24 letters stated that the purchase price of Cox's
25% ownership interest would be calculated based on the retained earnings of
Southern Garrett as of August 31, 2003, i.e., on the last day of the month in which
Cox's withdrawal occurred. Enclosed within the envelope of the September 24, 2003
letter was a check for $506,208.91. This offer substantially complied with paragraph
4.5 of the Membership Regulations. Cox deposited the $506,208.91 check into his
account, indicating his acceptance of the figure. 

 We hold that the language of the September 24, 2003 letter was sufficient to
constitute an offer for Cox's Membership Interest in Southern Garrett and that Cox's
act of depositing the check was an acceptance of the offer. The relevant language of
the September 24 letter that included the check Cox deposited reads:

 Your signed acceptance of the aforementioned items constitutes
the full agreement that your ownership and consequently any rights to
past, present, and future profits in SG will be relinquished in full as of
August 31, 2003. Furthermore, you waive any future rights or claims to
ownership, compensation, contracts, properties, representation, or any
business activities directly or indirectly pertaining to the management
and operation of Southern Garrett, LLC. As a result, G Thomas Cox
will be released from any and all current and future liabilities related to
the operation of Southern Garrett, LLC. 


Although Cox did not sign the September 24 letter, by signing and depositing the
check for $506,208.91 Cox accepted the buyout of his ownership interest in Southern
Garrett and completed his effective withdrawal from the company effective August
31, 2003. 

 We overrule Cox's first issue.

 Breach of Fiduciary Duty

 In his second issue, Cox argues that the "trial court erred when it granted
directed verdict against Cox on his claim for breach of fiduciary duty." Cox argues
that three sets of circumstances support a finding of a fiduciary relationship, at least
among Moyers, Southern Chemical, and Brueggeman, the co-owners of the closely-held corporation Southern Garrett, which repurchased Cox's 25% Membership
Interests. First, Cox argues that a fiduciary relationship may be created through the
repurchase of a shareholder's stock in a closely held corporation. Second, he argues
that a fiduciary relationship may be created in a closely held corporation in which the
shareholders operate more as partners than in strict compliance with corporate form. 
Third, he contends that when a fiduciary profits or benefits in any way from a
transaction with a beneficiary of the fiduciary relationship, a presumption of
unfairness arises that shifts both the burden of producing evidence and the burden of
persuasion to the fiduciary to show that the transaction was fair and equitable to the
beneficiary. 

 In his sixth amended petition, Cox alleged that defendants breached their
fiduciary duties to him by "their various defalcations, self-dealing, dishonesty, void
transfers of ownership in Southern Garrett, and failure and refusal to disclose facts
and account to Cox for profits." He also asked the trial court to "enforce the
Regulations by setting aside the void and fraudulent transfers of ownership interests
in Southern Garrett to Excelerate and Korkmas and to impose a constructive trust on
the assets thereof for the benefit of Cox." On appeal, Cox contends that defendants
breached their fiduciary duty to him by failing to "show that the transaction in which
they sought to acquire Cox's 25% interest in Southern Garrett was fair and equitable
to Cox."

 As we held with respect to Cox's first issue, section 4.2 of the Membership
Regulations does not apply and Cox withdrew from Southern Garrett effective August
31, 2003. Because Cox's breach of fiduciary duty claim in regard to voiding his 25%
Membership Interest depended on his section 4.2 argument, his claim fails as a matter
of law. Cox's breach of fiduciary duty claim in regard to the fraudulent transfers of
ownership to Excelerate and Korkmas likewise fails because both of those
transactions occurred after Cox had withdrawn from Southern Garrett. Because Cox
was no longer a Member after that date, Southern Garrett owed him none of the duties
owed members after that date. Accordingly, we conclude that the trial court properly
granted directed verdict because the evidence conclusively proves Southern Garrett's
right to judgment as a matter of law.

 We overrule Cox's second issue.

 Piercing the Corporate Veil

 In his third issue, Cox argues that the "trial court erred when it granted directed
verdict against Cox on his claim for piercing the corporate veils of Excelerate and
ABC Chemical." 

 The various doctrines for piercing the corporate veil are not substantive causes
of action. See Mapco, Inc. v. Carter, 817 S.W.2d 686, 688 (Tex. 1991). Rather, they
are a means of imposing on an individual a corporation's liability for an underlying
cause of action. See Farr v. Sun World Sav. Ass'n, 810 S.W.2d 294, 297 (Tex.
App.--El Paso 1991, no writ) (citing Gulf Reduction Corp. v. Boyles Galvanizing &
Plating Co., 456 S.W.2d 476, 480 (Tex. Civ. App.--Fort Worth 1970, no writ)).
"Without an underlying cause of action creating corporate liability, evidence of an
abuse of the corporate form is immaterial." See Specialty Retailers, Inc. v. Fuqua, 29
S.W.3d 140, 147 (Tex. App.--Houston [14th Dist.] 2000, pet. denied).

 Because we have already concluded that Cox effectively withdrew from the
company no later than August 31, 2003 and that any causes of action in regard to
piercing the corporate veil happened after this date, we likewise conclude that the
trial court properly granted directed verdict on Cox's piercing the corporate veil
theories. 

 We overrule Cox's third issue on appeal.







Conclusion


 We affirm the judgment of the trial court.





 Evelyn V. Keyes

 Justice


Panel consists of Justices Nuchia, Keyes, and Higley.
1. Garrett Petrochemicals is a subsidiary of Garrett Oil. 
2. Lyondell and Garrett Petrochemicals signed an agreement on November 1, 2002. 
3. The trial court granted judgment in favor of Cox on the defendants' counterclaim. 
The defendants do not challenge this ruling on appeal. 
4. Question 1 asked the jury, "Did Tommy Cox and Southern Garrett, L.L.C., agree that
Southern Garrett, L.L.C., would purchase Tommy Cox's 25% share in Southern
Garrett for $550,000?"